IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


SUMMIT SOLUTIONS, INC., *et al.*,        :

    Plaintiffs,                          :
                                   Case No. 3:07cv142

        vs.                           :
                                     JUDGE WALTER HERBERT RICE

KEVIN REMLEY,                            :

    Defendant.                           :


---

DECISION AND ENTRY OVERRULING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (DOC. #41) ON DEFENDANT'S
COUNTERCLAIM (DOC. #9)

---

Plaintiff Jeff LaFave is the founder of Plaintiff Summit Solutions, Inc.

("Summit"), and, up until the events in question, was the sole owner of that

business. Doc. #1, ¶ 18 (Compl.).  In October 2003, Defendant Kevin Remley and

Summit formed a new business entity, SummitQwest LLC ("the LLC"), with

Summit holding a 51% ownership interest in the LLC and Remley holding a 49%

interest. Doc. #9, ¶ 11 (Ans./Counterclaim).[1]

---

[1]The Complaint alleges that the Court has diversity jurisdiction over these
parties. Doc. #1 ¶ 4.  The diversity Code provision requires that the parties be of
diverse "citizenship" and, further, that "a corporation shall be deemed to be a
citizen of any State by which it has been incorporated and of the State where it
has its principal place of business." 28 U.S.C. § 1332(a)(1), (c)(1).  The Complaint
avers that Summit has its principal place of business in Ohio, LaFave is an Ohio
"resident" and Remley is a "resident" of New Jersey. Doc. #1 ¶¶1-3.  Because the
Defendant has not contested the Court's jurisdiction either in his Answer or by
filing a motion to dismiss under Rule 12(b)(1), for failure to properly allege

Beginning in 2005, LaFave and Remley began discussing integrating the LLC into Summit, in order to conduct business as a single entity. Id. ¶ 20. Except for the signing of the corporate agreements, the two businesses were seemingly integrated by the end of that year. Id. ¶ 26. Problems soon arose, however, as to the identity of the owners of the newly-integrated Summit, with Remley considering himself to be an owner of 25% of the business and the Plaintiffs considering LaFave as continuing to have a 100% ownership interest therein. Id. ¶¶ 26, 34, 36-38. It is the question of Summit's ownership that forms the basis of the Motion presently before the Court.

The Plaintiffs originally brought suit asking the Court for the following declarations: (1) that Remley had relinquished his rights in the LLC; (2) that Remley had relinquished his rights in an asset that he was to have transferred to the LLC and the LLC was to have transferred to Summit, upon integration;[2] (3) that Remley is not entitled to any equity ownership in Summit; and (4) that Remley is entitled to no other payments or benefits related to or arising out of his relationship with Summit or the LLC other than certain payments set forth therein. Doc. #1 at 6-7.

_____

"citizenship", the Court presumes that the parties' citizenship is diverse, as inferred by the Complaint, and, thus, it has subject matter jurisdiction over the present claims.

[2]In his Answer/Counterclaim, Remley admits that this asset (referred to as the "Data Center") was an asset of the LLC. Doc. #9, ¶ 11.

Remley then filed a counterclaim, asserting the following three causes of action, all of which pertain to his assertion that he is a 25% owner of the newly-integrated business: (1) breach of contract (Count I); (2) promissory estoppel (Count III); and (3) unjust enrichment/quantum meruit (Counts II and IV).[3] Doc. #9 at 11-13. The Plaintiffs have moved for summary judgment on all of these claims.[4] Doc. #41. For the sake of simplicity, the Court will refer to the parties as Plaintiffs and Defendant, herein, rather than as Plaintiffs-Counterdefendants and Defendant-Counterclaimant.

The Court will begin with a review of the pertinent facts and then set forth the standard for ruling on summary judgment motions. Finally, it will consider each of the Defendant's claims, in light of the relevant law.

_____

[3]Remley sets forth separate claims for unjust enrichment and quantum meruit. As this Court has previously recognized, however, "[q]uantum meruit 'contains the same elements as required for recovery under unjust enrichment. The difference is the manner in which damages are computed. In unjust enrichment, damages are conferred in the amount the defendant benefitted. In quantum meruit, damages are the measure of the value of the plaintiff's services.'" Hartley v. Dayton Computer Supply, 106 F. Supp. 2d 976, 984 (S.D. Ohio 1999) (quoting Loyer v. Loyer, 1996 Ohio App. LEXIS 3432,*3 (Ohio Ct. App. Aug 16, 1996)). Thus, the Court will consider the two claims as one herein.

[4]The Court notes that Remley cannot ultimately win on both his breach of contract claim and his promissory estoppel and unjust enrichment claims, since "[q]uasi-contract claims such as unjust enrichment and promissory estoppel apply in the absence of a contract." Gevedon v. Gevedon, 167 Ohio App. 3d 1, 9 (Ohio 2nd App. Dist. 2006). At this stage of the litigation, however, the Court will consider the viability of all claims. Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, LTD., 476 F. Supp. 2d 809, 826 (S.D. Ohio 2007) ("Ohio law permits a party to plead unjust enrichment and breach of contract as alternative theories.").

I.     <u>Facts</u>[5]

In 1999, LaFave established Summit, a corporation engaged in the business

of management consulting, with a primary emphasis in the area of ground

transportation management services.[6] Doc. #41, Attach. #1 (LaFave Aff.) ¶ 2;

Doc. #47, Attach. #1 (Remley Aff.) ¶ 11.  In its early years, Summit did business

with Remley, while he was employed at an unrelated business. Doc. #47, Attach.

#1 ¶ 4.  In 2003, Remley made a business proposal to Summit, wherein a new

company would be formed. <u>Id.</u> ¶ 9; Doc. #41, Ex. #2 (Remley's LLC Proposal).

This business proposal became the LLC. Doc. #47, Attach. #1 ¶ 10.

In October 2003, the LLC filed Articles of Organization in New Jersey, but

an operating agreement was never executed. <u>Id.</u>  Summit was a 51% owner and

Remley a 49% owner of the LLC.[7] <u>Id.</u>; Doc. #65 (LaFave Dep.) at 42.  In

_____

[5]Since this case comes before the Court on the Plaintiffs' Motion for
Summary Judgment, the Court sets forth the facts and circumstances giving rise to
it in the manner most favorable to the Defendant. <u>Servo Kinetics, Inc. v. Tokyo
Precision Instruments</u>, 475 F.3d 783 (6th Cir. 2007).

[6]The Plaintiffs state that Summit is a corporation "engaged in the business
of management consulting with an emphasis in the area of information technology
consulting." Doc. #41, Attach. #1 (LaFave Aff.) ¶ 2.  The Defendant, on the other
hand, states that Summit "provide[d] primarily ground transportation management
services" while the new LLC "was established to provide IT consulting services."
Doc. #47, Attach. #1 (Remley Aff.) ¶ 11.  It appears that Summit's focus perhaps
shifted from providing primarily ground transportation management services to
providing more general information technology consulting services at the time
Summit integrated its services with the LLC.  The distinction is not important for
purposes of this Decision, however.

[7]Although Remley and LaFave both agree that Summit and Remley were the
only owners of the LLC, the Plaintiffs have filed an excerpt from Dan Nelson's

4

establishing the LLC, Summit agreed to provide $500,000 in startup capital, in 2004 and 2005, as well as providing on-going administrative support services. Doc. #47, Attach. #1 ¶ 13.  Remley provided no capital outlay, but agreed to manage and develop the business for a salary of $200,000 a year. Id.; see also Doc. #41, Ex. #2 (Remley's LLC Proposal) at 2.  For reasons about which the parties disagree, but which are not important to the issues presently before the Court, in April 2005, the parties began negotiations about integrating some or all of the business operations of the LLC into Summit. Doc. #47, Attach. #1 ¶ 22.

Remley entered into discussions with LaFave, along with two other individuals, Jim Oswald and Dan Nelson, concerning how the business integration would work and what the management and ownership structure of the newly-integrated Summit would be.  According to emails that LaFave sent to the other men in the summer of 2005, the integration process was to take place in four steps, to wit:  (1) complete the documentation memorializing the agreement they had already reached on the new organizational structure and roles/ responsibilities; (2) work through the integration logistics; (3) reach an agreement on the ownership structure for Summit; and (4) reach an agreement on the new ownership structure of the LLC. Doc #65-3, Ex. #11.  Despite not completing the documentation, as suggested in step #1, the integration of the businesses actually began July 1,

_____

Deposition, which indicates that Nelson thought he was also an owner of the LLC. Doc. #66, Ex. #5 (Nelson Dep. Excerpt) at 53, 72-73; accord Doc. #66, Ex. #6 (Leszcuk Dep. Excerpt) at 67-68.

2005. Id.  As to the ownership of the newly-integrated business, in an email dated July 24, 2005, LaFave proposed that the equity split would be as follows:  LaFave - 51%; Remley - 22%; Oswald - 14%; Nelson - 12%. Doc. #65-3, Ex. #14.

In October 2005, LaFave sent the following three documents to Remley, Oswald and Nelson:  Employment Agreement, Summary of Understanding and Amended Close Corporation Agreement. Doc. #41, Attachs. ##9, 10.  The latter two documents included the heading "DRAFT – For Discussion Purposes Only". The email from LaFave attaching these documents stated that "[i]f at all possible, I would like your feedback by our [January 2006] meeting in Tampa so we can discuss as a group [whether] there any major issues/concerns.  From there, I will be able to get the revisions made, gain everyone's approval on them and then forward the two documents to Joe Oehlers for his legal review", as well as noting that "[o]nce we reach agreement on these, I will ask Joe Oehlers to provide a final legal review of [the] documents as well as determine what additional documents/processes we need to complete (I am envisioning some corporate resolutions, etc. will need to be issued, issuance of stock certificates, etc. to allow for these changes)." Doc. #41, Attachs. ##9, 10.  These proposed documents were never signed.

As to the integration of the two business, these documents indicated that the operational part of the integration was "currently ongoing" and that "we must ensure that all operations are integrated and finalized," which includes "following

common policies, process and procedures and ensuring all working relationships and the roles fulfilled by each of us are fully understood and executed." Doc. #41, Attach. #9 (Summary of Understanding) at 13. The documents also indicated that the financial integration of the businesses was ongoing and, with certain limited exceptions: all new clients will be Summit clients, beginning immediately; all active LLC clients will become Summit clients, as of January 1, 2006; all active LLC vendors will become Summit vendors, effective January 1, 2006; any LLC cash balances will be moved to Summit, effective December 31, 2005; all LLC employees will become Summit employees; and all LLC financial contracts will need to be reviewed in light of the financial integration. Id.

As to the management structure proposed in these documents, the four men (LaFave, Remley, Oswald and Nelson) would comprise the Executive Committee, with LaFave serving as Chief Executive Officer, Remley as Principal of Business Development, Oswald as Principal of Client Services and Nelson as Principal of Business Integration. Id. at 10-11. With regard to ownership interests, the Summary of Understanding indicated that the ownership structure of Summit would change "[a]s a result of the integration of [the two businesses]." Id. at 12. And, more specifically, that "beginning around January 1, 2006 (and assuming all the necessary documents are finalized and executed by that date), the ownership structure of [Summit] will be as follows:

- [LaFave] – ownership of 51% of the outstanding common shares
- [Remley] – ownership of 25% of the outstanding common shares

- [Oswald] – ownership of 12% of the outstanding common shares
- [Nelson] – ownership of 12% of the outstanding common shares"

Id.

According to Remley, at some point in time (and apparently before the end of October 2005), he consolidated the LLC's books and records with Summit's, began soliciting new business through Summit, rather than through the LLC, transferred all existing customers of the LLC to Summit and transferred the LLC's assets to Summit.[8] Doc. #47, Attach. #1 (Remley Aff.) ¶¶ 26-27, 30, 32, 34.

---

[8]The Court pauses here to note that the parties have presented considerably different views about some of the more essential elements of the business transaction in question. Most notably, Remley characterizes the "integration" of the LLC and Summit as essentially a merger of the LLC into Summit, as noted in the text accompanying this footnote, while the Plaintiffs point to the Summary of Understanding (albeit to nothing concerning what actually happened after that document was drafted) in stating that the parties understood that the integration was "just that, [an] integration . . . [and] not a merger or acquisition. Instead, we will integrate most of the business of [the LLC] and most of the employees of [the LLC] into [Summit]." Doc. #66 (Pls' Reply Mem.) at 7 (citing Doc. #41, Attach. #9 ("Summary of Understanding") at 10; but see Doc. #65-3, Ex. #14 (Email from LaFave to Remley, Nelson and Oswald, dtd. July 24, 2005) ("We are faced with an interesting challenge whereby we are trying to integrate (merge) two existing organizations . . . .") (emphasis added). Neither party makes any mention of the continuing viability, either financially or operationally, of the LLC after its "integration" into Summit, although the Plaintiffs' Complaint indicates that at some point in time, seemingly around the time the integration decision was made, "the LLC had no going concern value." Doc. #1 ¶ 14. Contrast Doc. #65-3, Ex. #14 (LaFave Email, dtd. July 24, 2005) (indicating that "the value of [the LLC] is most likely between $500,000 and $1.0 million"). The Defendant denies this assertion. Doc. #9 ¶ 14.

Further, the record provides conflicting evidence about whether Remley transferred his 49% ownership interest in the LLC to Summit, as a part of the integration. In his affidavit testimony, Remley suggests that he transferred his interest in the LLC to Summit, while in his Answer to the Complaint, he denies that he agreed to relinquish his interest in the LLC. Doc. #9 (Ans.) ¶ 17; Doc. #47, Attach. #1 (Remley Aff.) ¶ 41 (in contrasting his position with regard to an

Remley testified that at the time he considered the two businesses to be "integrated" (in the fall of 2005), he understood that any sort of equity arrangement in the integrated business was going to include the execution of a buy-sell agreement, close corporation agreement and employment agreements. Doc. #42 (Remley Dep.) at 151-52.

In October 2005 (the same month that LaFave sent the three documents), Remley obtained an asset in a settlement with his former employer, which is referred to as the "Data Center". Remley explains that "the Data Center is a 2100 square foot center near Tampa, Florida, which, among other things, provides a high performance information technology infrastructure for clients." Doc. #47, Attach. #1 ¶ 28. The following month, Remley sold the Data Center to Summit for $200,000, although, according to Remley's testimony, it was worth $400,000. Id. ¶ 29.

---

ownership interest in Summit to that of Oswald's and Nelson's, stating "[n]either Oswald nor Nelson transferred 49% of a growing company upon the promises of equity in Summit"). The Plaintiffs also seem to take conflicting positions on this point. In their Reply Memorandum, while attempting to refute Remley's suggestion that he was promised a 25% equity position in Summit in exchange for his 49% interest in the LLC, the Plaintiffs point again to the Summary of Understanding which states that "the ownership structure of [the LLC] will likely change from the current structure of [Summit] owning 51% of the outstanding common shares and [LaFave] owning 49% of the outstanding common shares. We will determine the final ownership structure of [the LLC] . . . as we consider other relevant factors." Doc. #66 (Pls' Reply Mem.) at 7 (citing Doc. #41, Attach. #9 ("Summary of Understanding") at 12). Yet, in their Complaint, the Plaintiffs allege that Remley agreed to relinquish his interest in the LLC and request, in their prayer for relief, that the Court declare that he has so relinquished that interest. Doc. #1 ¶¶ 17, 29A.

By the end of October 2005, the four men had "assum[ed] their new roles and responsibilities" with Summit, apparently in concert with the management structure as proposed in the Summary of Understanding.[9] Doc. #42 at 30. In his new role as Summit's Principal of Business Development, Remley worked to develop new business for Summit. Doc. #47, Attach. #1 ¶ 34.

No corporate documents had been signed at this point in time, although, according to Remley, LaFave "promised that a close corporation agreement would be executed by the Executive Team by the end of 2005," given that the material terms of integration were agreed upon and performed. Id. ¶¶ 30- 31. According to Nelson, LaFave told him that they would sign the Amended Close Corporation Agreement and Employment Agreements when the Executive Team traveled to Tampa for a meeting in early 2006.[10] Doc. #62 (Nelson Dep.) at 185-86.

In late 2005 and early 2006, Remley secured new capital for Summit by soliciting $300,000 worth of loans from friends and family, which he personally

---

[9]Prior to the integration, LaFave was the CEO of Summit and the President of the LLC, Remley was the Executive Vice President of the LLC, Oswald was the President of Summit, and Nelson was the Vice President of the LLC. Doc. #65-3, Ex. 11 (Email from LaFave, dtd June 27, 2005).

[10]The Court notes that Nelson's testimony conflicts with the emails LaFave sent to the other three men in October 2005, which attached the documents and wherein he stated that he wanted their feedback on the documents "by our meeting in Tampa so we can discuss as a group [whether] there any major issues/ concerns," after which he would have "revisions made, gain everyone's approval on them and then forward the two documents to Joe Oehlers for his legal review." Doc. #41, Attach. #10. In interpreting the evidence in the light most favorable to Remley, the Court could conclude that LaFave told Nelson, sometime after he sent this email, that they would actually sign the documents in Tampa.

guaranteed in the event that Summit defaulted on the loans. Doc. #47, Attach. #1 (Remley Aff.) ¶ 35. According to Remley, in so doing and "[w]ith the knowledge and approval of LaFave, [he] represented [himself] as a 25% owner of Summit." Id. At least one of the persons who loaned money to Summit (and who was also a Summit employee) thought that Remley was one of Summit's co-owners. Doc. #61 (Huttenberg Dep.) at 71-73, 87-90.[11]

In March 2006, Summit did not have sufficient cash on hand to meet its payroll obligations. Doc. #65, Attach. #6 at 37 (LaFave Email). LaFave emailed Remley, Oswald and Nelson and proposed two options regarding this problem, to wit: (1) postpone payroll until funds were available, or (2) "[t]he four of us as principals of the company come up with the funds to cover payroll." Id. Therein, LaFave also lamented that he "need[ed] to share with [them] the emotional/ psychological burden associated with the financial responsibilities we have accepted as principals of [Summit]." Id. at 39. In response, Remley wired $50,000 to Summit to help cover the payroll shortfall, as well as temporarily deferring his own compensation. Doc. #42 (Remley Dep.) at 113-15; Doc. #47, Attach. #1 (Remley Aff.) ¶ 36.

In mid-2006, LaFave, Remley and Oswald decided that Nelson would not be

_____

[11]When questioned about what had given her the impression that Remley was a co-owner, Ms. Huttenberg first said, "Well, certainly from [Remley], right, [Remley] had certainly told me that," but then went on to say "nobody ever said, you know, 'I'm an owner. He's not an owner.' Nobody ever said, you know, anything like that. It was very much like . . . that was the group. That was who the firm belonged to." Doc. #61 (Huttenberg Dep.) at 72-73.

a suitable co-owner and relayed this news to Nelson, which prompted Nelson to leave the business. Doc. #42 (Remley Dep.) at 146-48; Doc. #47, Attach. #1 (Remley Aff.) ¶ 37. Remley testifies that, after his departure, Nelson's "12% equity stake was <u>given</u> to Oswald, [while] LaFave and I stayed at 51% and 25% respectively."[12] Doc. #47, Attach. #1 (Remley Aff.) ¶ 37 (emphasis added).

According to Remley, once Nelson was removed from the business, "LaFave and Oswald assured [him] that . . . there were no obstacles to getting the close corporation agreement signed." <u>Id.</u> ¶ 38. However, soon thereafter, Oswald began to waiver in his commitment to making the financial obligation to the business, as an owner. <u>Id.</u> In February 2007, Oswald informed LaFave and Remley that he wanted to remain an employee, rather than having an equity interest in the company. Doc. #41, Ex. 1-C (Oswald Email, dtd. Feb. 18, 2007). According to Remley, Oswald told him that his (Oswald's) decision was not intended to affect Remley's 25% interest in Summit. Doc. #47, Attach. #1 ¶ 40.

Oswald's decision caused Remley to inquire of LaFave as to whether that decision had changed LaFave's views on the overall structure of the company and also to let LaFave know that he was "fully committed to moving forward as we've discussed with minor changes to the documents." Doc. #41, Ex. 1-C. In response,

---

[12]It is unclear what contributions, if any, Nelson and Oswald made to Summit, as owners or would-be owners. Remley suggests that neither individual contributed anything, in stating that "[n]either Oswald nor Nelson transferred 49% of a growing company upon the promises of equity in Summit." Doc. #47, Attach. #1 ¶ 41.

LaFave's initial reaction was that the option of Remley's acquiring an equity interest in Summit was off the table, given Oswald's withdrawal from the equation. Doc. #41, Ex. 1-C.

Soon thereafter, in March 2007, Remley sent an email to LaFave with comments on the draft business documents that LaFave had sent him in October 2005. Doc. #41, Ex. 1-D (Remley Email, dtd. March 5, 2007). In response, LaFave indicated that there seemed to be a "very significant disconnect" in thought processes regarding moving forward with the proposed arrangement without Oswald. Id. LaFave then stated that equity sharing was not going to proceed without Oswald's participation and, instead, presented employment packages (rather than equity proposals) to the two men for consideration. Doc. #41, Attach. #1 (LaFave Aff.) ¶ 16. The filing of the present suit followed.

II. <u>Summary Judgment Standard</u>

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." Mich. Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be

14

resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th

Cir. 1992) (citation omitted).  In determining whether a genuine issue of material

fact exists, a court must assume as true the evidence of the nonmoving party and

draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255.

If the parties present conflicting evidence, a court may not decide which evidence

to believe, by determining which parties' affiants are more credible; rather,

credibility determinations must be left to the fact-finder. 10A Wright, Miller &

Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

       In ruling on a motion for summary judgment (in other words, in determining

whether there is a genuine issue of material fact), "[a] district court is not . . .

obligated to wade through and search the entire record for some specific facts that

might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889

F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S.

Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v.

Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . .").  Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon

those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its

15

attention by the parties.

III.    Breach of Contract (Count I)

   A.    Law

The elements of a breach of contract claim include "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." State v. Netherland, 2008 Ohio 7007, ¶ 37 (Ohio 4th App. Dist. Dec. 23, 2008) (citation omitted).  Ohio courts recognize that the essential elements of a contract "include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." Minster Farmers Coop. Exch. Co. v. Meyer, 117 Ohio St. 3d 459, 464, 884 N.E.2d 1056 (2008) (quoting Kostelnik v. Helper, 96 Ohio St.3d 1, 3-4, 770 N.E.2d 58 (2002)).  Further, "[a] meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." Kostelnik, 96 Ohio St. 3d at 3-4 (citation omitted).

Although a written agreement is preferable, an oral agreement may be enforceable if there is "sufficient particularity to form a binding contract." Id. at 3 (citation omitted).  Terms of an oral contract may be determined from "words, deeds, acts, and silence of the parties." Id. (quoting Rutledge v. Hoffman, 81 Ohio App. 85, 75 N.E.2d 608 (Ohio 12th App. Dist. 1947)).

With regard to express versus implied contracts, Ohio courts recognize that

16

both can be legally binding. <u>Contship Containerlines v. Howard Indus.</u>, 309 F.3d 910 (6th Cir. 2002).

> It is a fundamental tenet of contract law that a legally binding contract can be implied from the circumstances and conduct of the parties. In circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract, a contract implied in fact arises. An implied-in-fact contract is one that is founded upon a meeting of minds which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.

<u>Id.</u> at 912-13 (quotations omitted). Therefore, "the distinctive feature of an implied in fact contract is that it is implied from conduct and circumstances; aside from this there is no difference between an express contract and an implied contract." <u>Id.</u> at 913 (quotation omitted).


B.    <u>Parties' Positions</u>

In the present case, Summit contends that no contract existed, for the following reasons: (1) the documents were merely drafts that were never signed; (2) the proposal was for a four-way (or later three-way) equity partnership and since the identify of the partners was never settled upon (as indicated by Oswald's and Nelson's departure from the arrangement), there was never a meeting of the minds as to the essential terms of the agreement; and (3) the discussions between the parties were merely preliminary negotiations, and enforcing such preliminary negotiations would frustrate the rule of law that says that parties should be able to

choose the point at which they can no longer back out of a business proposition. Doc. #41 at 8-11; Doc. #66 at 1-7 (citing <u>Skycom Corp. v. Telstar Corp.</u>, 813 F.2d 810, 815 (7th Cir. 1987) for proposition regarding preliminary negotiations). In contrast, Remley argues, among other things, that the parties had an implied in fact contract, as evidenced by the conduct of the parties in integrating the two businesses. Doc. #47 at 16-21.

       C.    <u>Application of Law to Facts</u>

In general, the Court concurs with Summit's first two arguments. The agreement, as proposed in the documents, is not a contract, given that the documents were never signed and the parties were never conclusively established. <u>Alligood v. Proctor & Gamble Co.</u>, 72 Ohio App. 3d 309, 311 (Ohio 1st App. Dist. 1991) ("It is basic contract law that to have an enforceable contract, there must be a meeting of the minds of the parties to the contract."). As to Summit's third argument, however, the Court concludes that the argument works against Summit, with regard to the implied agreement between Summit and Remley.

Ohio courts have indeed recognized that preliminary negotiations or "agreements to agree" are not generally enforceable. <u>E.g.</u>, <u>Commerce Benefits Group, Inc. v. McKesson Corp.</u>, 2008 U.S. Dist. LEXIS 22262, *14 (N.D. Ohio Mar. 20, 2008). However, such agreements are enforceable "when the parties have manifested an intention to be bound by their terms and when these intentions

are sufficiently definite to be specifically enforced." Telxon Corp. v. Smart Media of Del., Inc., 2005 Ohio 4931, ¶ 42 (Ohio 9th App. Dist. Sept. 21, 2005) (quoting Oglebay Norton Co. v. Armco, Inc., 52 Ohio St.3d 232, 236, 556 N.E.2d 515 (1990)).  Therefore, courts must determine whether "the parties manifested a sufficiently definite intention to be bound such that an agreement would be specifically enforceable, or whether they merely negotiated toward a formal contract without ever reaching it." Id.

The Court concludes, in the present case, that there exists a genuine issue of material fact as to whether the parties (Summit/LaFave and Remley, not Oswald and Nelson) manifested a sufficiently definite intention to be bound to a proposed agreement.  The facts, as interpreted in the light most favorable to Remley, as the party against whom the motion is directed, indicate that as of the critical time period in this litigation (the fall of 2005), at LaFave's direction,[13] Remley moved a significant part of the operational and financial operations of the LLC (of which Remley was a 49% owner) to Summit, in exchange for his receipt of an ownership in Summit.  It can be implied that once Remley took the steps to integrate the two businesses (and implicitly diminished the value of his interest in the LLC), in accordance with the LaFave's direction and with no indication that LaFave

---

[13]This direction can be inferred from both the conversations that occurred in the summer of 2005, wherein LaFave states that the integration began July 1, 2005, and the Summary of Understanding, which LaFave transmitted in October 2005 and which instructed that the remaining  steps of integration were to happen either "immediately" or before January 1, 2006.

19

attempted to stop the process because he considered the negotiations to be "preliminary", there was a sufficiently definite intention expressed by both LaFave and Remley to be bound to the proposed agreement.[14] As noted above, the Sixth Circuit recognizes the fundamental tenet of contract law that "a legally binding contract can be implied from the circumstances and conduct of the parties. In circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract, a contract implied in fact arises." Contship Containerlines, 309 F.3d at 912-13.

The Court concludes that, according to the ordinary course of dealing and the common understanding of men, LaFave and Remley showed a mutual intention to contract at the time Remley took the necessary steps to integrate the LLC into Summit, based on the implicit understanding in the discussions surrounding the integration that such integration was part and parcel of Remley's receiving an equity interest in the newly-integrated business. Because there is a genuine issue

_____

[14]The Court finds Summit's argument a bit disingenuous when it points to the language in the Texlon decision wherein the court, in articulating why negotiations that are merely preliminary are not binding contracts, stated that "[a] merger or the acquisition of assets will create many potential difficulties, and the parties should be able to choose with precision the point at which they can no longer back out." Doc. #66 at 4 (quoting Texlon Corp., 2005 Ohio 4931, ¶42). Relying on this language, Summit goes on to argue that the parties had not reached the point of no return in October of 2005, as evidenced by the fact that Remley sent an email responding to the proposed documents, in April 2007. Clearly, however, the parties had reached the point of no return when Remley took the steps LaFave had directed him to take in transferring most of the operations and finances of the LLC (of which Remley was a 49% owner) into Summit's corporate structure.

of material fact as to whether there was an implied in fact contract between

LaFave/Summit and Remley, Summit's Motion for Summary Judgment (Doc. #41),

as to the breach of contract claim (Count I), is OVERRULED.


IV.    Promissory Estoppel (Count III)

   A.    Law

   In order to prevail on a promissory estoppel claim, a plaintiff must show "the

existence of a promise that the promisor should reasonably expect to induce action

or forbearance by the promisee and that does induce such action or forbearance."

Rucker v. Everen Secs., Inc., 102 Ohio St. 3d 1247, 1248, 811 N.E.2d 1141

(2004) (citing Mers v. Dispatch Printing Co., 19 Ohio St.3d 100, 483 N.E.2d 150,

syl. ¶ 3 (1985)).  "The promise will be binding if injury can be avoided only by

enforcement of the promise." Id.

   To establish a claim of promissory estoppel, a plaintiff must prove the

following elements:  "(1) a promise, clear and unambiguous in its terms; (2)

reliance [on the promise] by the party to whom the promise is made; (3) that the

reliance was reasonable and foreseeable; and (4) that the party claiming estoppel

was injured by the reliance." Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 503

(6th Cir. 2003) (quoting Rigby v. Fallsway Equip. Co., Inc., 150 Ohio App. 3d 155,

779 N.E.2d 1056, 1061 (Ohio 9th App. Dist. 2002)).

B.    Parties' Positions

As to the first prong of the promissory estoppel test, Summit contends that it made no clear and unambiguous promise, because there was never any mention made, in the parties' discussions, of an exchange of Remley's 49% ownership interest in the LLC for a 25% interest in Summit and because the Summary of Understanding indicated both that equity would be addressed at some future time and that the parties would memorialize their agreements in final written documents.  With regard to the second and third elements of the claim, Summit argues that the proper focus is on whether Summit, as the promisor, should have reasonably expected the promise to induce action on Remley's part, Hortman v. City of Miamisburg, 110 Ohio St. 3d 194, 199, 852 N.E.2d 716 (2006) (relying on Restatement of the Law 2d, Contracts (1981) 242, § 90).  In this case, Summit argues, it was neither reasonable nor foreseeable for it to expect such reliance, given the on-going negotiations that occurred with regard to the identity of the equity partners.  Summit concludes its argument by stating that Remley has failed to demonstrate that he has been injured, pointing out that he continued to earn an annual salary as a Summit employee, was paid an agreed-upon amount for the Data Center he sold to Summit and was offered continued employment at Summit.

Remley, on the other hand, argues that the promise of an equity interest was sufficiently clear, in that it was part of the preliminary conversations between the parties and was also embodied in the Summary of Understanding, along with the

22

other two components of the integration transaction (the actual integration of the two businesses and the reassignment of executive roles), which were carried out pursuant to the general terms of the parties' discussions and the Summary of Understanding.  Remley also asserts that he relied on the promise of equity, as demonstrated by his transfer of the LLC's operational and financial functions to Summit[15] and that this reliance was reasonable given the parties' prior history of not memorializing business agreements in formal documents.  As to his injury, Remley argues that he moved the accounts and operations of the LLC, of which he was a 49% owner, to Summit and began focusing his efforts on growing Summit's business, rather than that of the LLC.

C.      Application of Law to Facts

The Court concludes that there is a genuine issue of material fact as to whether Remley has established the elements of his promissory estoppel claim.[16]

_____

[15]Remley argues that he also demonstrated reliance on the promise by contributing personal funds to Summit, to help with its financial problems, and by soliciting investments from friends and family members.  Because these actions occurred after the integration of the LLC into Summit (which the Court finds as sufficient evidence of reliance), it will not consider the same in ruling herein.

[16]The Court agrees with Remley that the cases cited by Summit, in support of its promissory estoppel argument, are too factually different to be helpful in this case.  Specifically, none of the cases include a proposed business transaction that included a "package deal" such as the one in the present case (business integration, change of executive status and transfer of ownership) where the parties carried out part, but not all, of the proposed deal. See R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984) (negotiations did not include unified plan, portions of which were implemented and portions of which (to include

He has set forth facts from which a jury could reasonably conclude that LaFave

clearly and unambiguously promised him an equity ownership interest in the newly-

integrated Summit, as an inherent part of the integration package, which included

the actual integration of the business (which LaFave had directed to commence

happening), the change of executive positions and the equity allocations. Once

again, the focus of this inquiry is not in 2006 or 2007 when Nelson's and

Oswald's situations changed, but rather at the time Remley began taking steps in

reliance on the promise, i.e., when he began integrating the two businesses, in the

summer of 2005. The evidence indicates that this reliance was reasonable and

---

the signing of documents as final proposed step in plan) were not); Gruen
Industries, Inc. v. Biller, 608 F.2d 274, 277 (7th Cir. 1979) (same); Continental
Fin. Servs. Co. v. First Natl. Boston Corp., 1984 U.S. Dist. LEXIS 23978 (D. Mass.
Aug. 30, 1984); Carcorp, Inc. v. Chesrown Oldsmobile-GMC Truck, Inc., 2007
Ohio 380 (Ohio 10th App. Dist. Jan. 30, 2007) (same).

     For example, in McCroskey v. State, 8 Ohio St. 3d 29, 456 N.E.2d 1204
(1983), the parties had negotiated about the construction and leaseback of a
building. After the negotiations had reached a point where the builder had
developed plans, the parties had agreed on a price and the State had sent the
builder a letter of intent, the State notified the builder that it had changed its mind
about the project. Id. at 29. The builder brought suit claiming promissory estoppel.
The Ohio Supreme Court found that the alleged representations made by the State
(e.g., agreeing to the terms of the proposed lease and mailing the letter of intent)
did not rise to the level of a promise, because the character of the negotiations
between the parties was more in the nature of negotiations of a future agreement.
Id. at 31.

     In the present case, if Remley had brought suit claiming promissory estoppel
after the preliminary discussions between the parties and after his receipt of the
Summary of Understanding, but before the businesses had been integrated and the
four men had begun operating in their new executive capacities with Summit, the
posture of this case would have been more aligned with McCroskey. In contrast,
however, the parties to the present transaction had moved far beyond the
McCroskey sort of preliminary negotiations into actual implementation of the
proposed plan, in accordance with LaFave's direction.

foreseeable to both Remley and LaFave, given the prior course of informal business

dealings between these two men[17] and also given the time-table of the steps of

integration, as established by LaFave in the preliminary discussions and the

Summary of Understanding (wherein the operational and financial integration of the

businesses was to begin and end in 2005, while the equity transfer was not

projected to take place until 2006). Doc. #41, Attach. #9 (Summary of

Understanding) at 12-13 (indicating that the business integration was ongoing and

was to conclude by January 1, 2006, and that "[a]s a result of the integration of

[the two businesses] the ownership structure of both organizations will change . . .

[beginning] around January 1, 2006 (and assuming all the necessary documents

were finalized and executed by that date)"[18]).  Remley has also set forth sufficient

evidence to create a genuine issue of material fact as to whether he sustained an

---

[17]Summit attempts to argue that Remley was a "sophisticated business man," as evidenced by his educational credentials and his prior business dealings, and, as such, should be held to a higher standard of conduct in the Court's analysis. Doc. #41 at 13.  While courts have certainly found the level of sophistication of a party to be a factor in making a promissory estoppel decision, e.g., Fin. Servs. Co. v. First Natl. Boston Corp., 1984 U.S. Dist. LEXIS 23978 (D. Mass. Aug. 30, 1984), any such consideration in this case is counterbalanced by the history between these parties of putting together business structures without formalizing appropriate business documentation.

[18]LaFave attempts to characterize the qualification that the documents had to be finalized and executed as being proof that there was no real promise that equity would ever change hands.  The Court concludes that the fairest interpretation of this phrase, construing the evidence most strongly against Remley, at the summary judgment stage of this litigation, is that the projected date to transfer ownership is an estimate and is subject to change if the documents have not yet been signed and finalized, rather than that there is a question as to whether Summit's ownership structure will change.

"injury", in that he transferred a significant part of a business of which he was a 49% owner to Summit, in reliance on receiving an ownership interest in Summit, and then began devoting his efforts to growing Summit's business, in his new capacity as a Summit executive, rather than continuing his efforts to grow the LLC's business.

Because there is a genuine issue of material fact as to whether LaFave made a promise to Remley, which LaFave should have reasonably expected to induce action by Remley and that did induce such action, Summit's Motion for Summary Judgment (Doc. #41), as to the promissory estoppel claim (Count III), is OVERRULED.


V.    Unjust Enrichment/Quantum Meruit (Counts II and IV)

    A.    Law

    In order to prevent unjust enrichment, Ohio courts have found the existence of implied-in-law contracts, or quasi-contracts.  As the Sixth Circuit explains, "[a] quasi-contractual obligation is one that is created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent." Reisenfeld & Co. v. Network Group, Inc., 277 F.3d 856, 860 (6th Cir. 2002) (quoting 1 Arthur Linton Corbin, Corbin on Contracts § 1.20 (1993)).  The elements of a quasi-contract claim include: "(1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3)

26

retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." Id. (citing Telephone Mgmt. Corp. v. Goodyear Tire & Rubber Co., 32 F. Supp. 2d 960, 972 (N.D. Ohio 1998); Hambleton v. R.G. Barry Corp., 12 Ohio St. 3d 179, 465 N.E.2d 1298, 1302 (1984)).

      B.    Parties' Positions

Summit argues that it is entitled to summary judgment, because it was not unjustly enriched through the acquisition of new accounts, since the accounts were procured either by other Summit employees or by the teamwork of Remley and others, while Remley was being paid a salary for the purpose of developing business.  Summit also argues that it was not unjustly enriched, because it is impermissible for Remley to complain now about selling the Data Center to Summit for a price less than it was worth, since courts generally do not inquire into the adequacy of consideration once it exists. Doc. #41 at 17-18 (citing, among others, Rogers v. Runfola & Assoc., Inc., 57 Ohio St. 3d 5, 565 N.E.2d 540 (1991)).

Remley counters that Summit was unjustly enriched for the following reasons:  he transferred the goodwill and existing business of the LLC (of which he was a 49% owner) to Summit; in his new role with Summit, he was responsible for booking several valuable clients for Summit that he would have otherwise booked through the LLC, as well as for growing accounts that he had previously transferred to Summit from the LLC; and he transferred the Data Center to

Summit, rather than keeping it and managing it for the benefit of the LLC, as well as selling that property to Summit for $200,000 less than it was worth. Remley concludes his argument by stating that he "did not integrate the LLC's existing business [and] goodwill, and obtain marquis client[s] [for Summit] . . . to earn a $200,000 per year salary. Remley was already earning $200,000 per year in compensation with the LLC and he owned 49% of the LLC." Doc. #47 at 35.

C.    Application of Law to Facts

The Court agrees with Remley that there exists a genuine issue of material fact as to whether Summit has been unjustly enriched, for fundamentally the same reasons as set forth in the previous analyses. Specifically, Remley transferred a major portion of the operations and finances of a business in which he was a 49% owner to Summit and essentially received nothing in return. He then took certain other steps (focusing his efforts on growing Summit's business, rather than the LLC, and selling the Data Center to Summit[19]), on the assumption that he was a

---

[19]As to the consideration for the Data Center sale, the Court agrees with Summit that courts should generally "not inquire into the adequacy of consideration once consideration is said to exist." Rogers v. Runfola & Assoc., Inc., 565 N.E.2d 540, 542 (Ohio 1991) (citing Judy v. Louderman, 48 Ohio St. 562, 29 N.E. 181 (1891)). However, at this point there is an issue of fact about whether consideration for that sale even existed, given Remley's assertions that he sold the Data Center to Summit only on the assumption that he was or would be a 25% owner of that business. See Irving Leasing Corp. v. M & H Tire Co., 16 Ohio App. 3d 191, 193, 475 N.E.2d 127 (Ohio 2nd App. Dist. 1984) ("Although courts generally do not inquire into the adequacy of consideration, the existence of consideration is a proper question.").

28

partial owner of Summit.  The extent to which his efforts were solely or jointly responsible for Summit gaining new work is a question of fact that remains for resolution at trial.  For now, the Court is bound to interpret the facts in the light most favorable to Remley and accept his testimony, which indicates that his efforts were essential in growing Summit's client base.  Furthermore, while it is true that Remley received a salary for his efforts while at Summit, the salary was the same as his salary at the LLC, where he would have had the additional benefit of his efforts working toward growing a business in which he had an equity interest.

Because there is a genuine issue of material fact as to whether Remley conferred a benefit upon Summit, of which Summit had knowledge and of which uncompensated retention would be unjust, Summit's Motion for Summary Judgment (Doc. #41), as to the unjust enrichment/quantum meruit claims (Counts II and IV), is OVERRULED.

VI.    Conclusion

The Plaintiffs' Motion for Summary Judgment (Doc. #41) as to Defendant's

counterclaim (Doc. #9) is OVERRULED, in its entirety.


March 9, 2009

   /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record